Thank you. May it please the Court? My name is Brian Wendler. I would like to reserve three minutes for rebuttal, please. I'm sorry. Tell me your name again. I don't have a correct name on the sheet. Brian Wendler. Wendler? Wendler, W-E-N-D-L-E-R. Did you sign in with the clerk? I don't think I did. We were expecting a Mr. Crosby. Mr. Crosby is here with me. Okay. All right. Mr. Wendler, you may proceed. May I ask who's going to argue the next case? Mr. Crosby has that case. Oh. Okay. We were co-counsel on the cases and we divided them up for appeal. But you were both counsel in both cases throughout the proceedings? Correct. I would like to reserve three minutes for rebuttal.  All right. In this case, there are some important key facts I think are important to repeat and reiterate before we get into the arguments. I represent 14 individuals who were truck drivers who were told by their employer that if they incurred debt of over $200,000 each to purchase trucks and lease the trucks to the employer to transport automobiles from the factories to dealership, they would become partners with the employer and receive their regular employment benefits through the company. These are truck drivers who are engaged in the business of transporting automobiles. They put 10 or 12 cars on the trailers. You see them on the freeways all the time with 10 or 12 cars, and they go to the car dealerships to deliver. So those trucks can't do anything else but transport cars, is that right? That's correct. Okay. I guess in theory they could, but they're designed specifically for transport. You couldn't take the cab and hook? Could you take the cab and hook it up to a trailer? No. The cabs on these trucks have what's called a head rack attached to the cab. The head rack and the cab are one section, and that attaches through a fifth wheel, a stinger-type device to the trailer. So the cab has the head rack attached to it. The head rack will hold two or three automobiles. So the O&O agreement contains a provision that says the employer, Pacific, has a right to restrict employment or to restrict the operator from working for other folks. And so it occurred to me that if this is a ñ is that a non-compete that's just either explicitly by contract or practically completely restrictive of the operator because it is in fact an auto transport vehicle? No, no. It's contractual only in nature because this is not in the record, but factually some of these drivers, when their contract was terminated, they went out and tried to find other work for smaller companies to transport automobiles, and some of them succeeded in that regard. But while under the contract they couldn't work for anybody else basically, right? Under the contract they could not, correct. So the owner operators as drivers couldn't go and work for somebody else, even if their cab was still leased to Pacific. Is that correct? No, I think the contract limits the use of the tractor-trailer. So we're only worried about whether they take their tractor-trailer and go and use it someplace else. Correct. So we didn't care whether the owner of the tractor-trailer let somebody else drive the tractor-trailer for the carrier for Pacific and then went off it himself and then drove for somebody else. That could have happened in theory, but these individuals were employed by PMT through the collective bargain agreement of the Teamsters Union. In theory it could have happened, but it didn't. The contract that was discussed with the drivers in exchange for their agreement to go into debt by over $200,000 each was a contract that was never shown to the drivers at all before they incurred this debt. So in order for them to see the contract, they had to agree and already sign on the dotted line to finance a truck to purchase. They did that. They were told that the union would have jurisdiction only over employment-related issues and not on lease-related issues. The contract, when the drivers ultimately signed on it. But did the union agree to that? I'm a little confused by that point. That's a very good issue because when the union asked to see the contract, the testimony and the record is the union was not allowed to see the contract and the drivers were told they can't even show the contract to the union representatives because it's trade secret and confidential. Okay. The bargaining unit was what? The Teamsters? Yeah. Was it all of these? How were they described? I'm not sure what you mean by that. Are they employees? Yes. Oh, definitely. In the collective bargaining agreement in the bargaining unit itself, they're the employees of the Pacific that are driving trucks? Yes. There's this niche of truck drivers, but they're called car haulers by trade. The contract had a 30-day termination clause, and the drivers never knew that before they incurred this debt. But they got the contract and it has a 30-day clause in it. The contract also had an arbitration clause in it. Counsel, you've now used six minutes of your time. You may want to get right to your arguments. I will. Well, there are three bases for having this court reverse the ruling of the trial court, and all these bases are alternative. First, the Federal Arbitration Act exemption for interstate transportation employees applies. Second, the contract itself has a clause in addition to the arbitration clause. The very next clause of the contract has a clause that says all other rights and remedies by law are available to the parties. And third, there was fraud in the inducement based on misrepresentations making the arbitration clause invalid. Point number one, under the Federal Arbitration Act found at 9 U.S.C. Section 1, there is an exemption from arbitration for mandatory arbitration requirements for, quote, any other class of workers engaged in foreign or interstate commerce. Counsel, this question has divided the district courts. It doesn't appear that any court of appeals has ever weighed in on this question. That is correct. The closest we came was we found the Lentz case, but that was just essentially in dicta where the court said, undisputedly, if Mr. Lentz were a truck driver, he would be considered a transportation worker under Section 1 of the FAA. So how do you get so the cases, there's a split in authority. It looks like sort of if you just count them, if you're just doing head counting and not counting of reasonableness of opinions, but if you're just doing head counting that more courts have held that this is a lease agreement and not an employment agreement. And I don't want to dispute the numbers. I'm just stating that's what it looks like to me as I've reviewed the cases. Now, when I look at this and I read operating agreement and equipment lease, what makes this a contract of employment? Well, if you look at the contract itself, and I think this is a critical point in directly addressing your question, page 1 of the contract, Section 202 of the contract says, drivers and other labor. In connection with the lease of the equipment, only drivers directed and employed by the carrier shall operate the equipment. Okay. That just gives the carrier the right to choose the drivers. Yes. That's correct. So in order for this equipment to even be used in conjunction with the lease, you have to have a PMT employee operating it. That's the contract that PMT created. Okay. But that doesn't tell us that this is not a lease. That doesn't tell us that this is a contract for employment. That's not the contract for employment. That just reserves to the carrier who's leasing this equipment the right to choose who gets to drive the equipment they're leasing. Okay. But the contract also says, and this is that section, let me find it here. Well, isn't it, let me just, isn't what's required here is an analysis, a detailed factual analysis of the right of control test, the federal common law right of control test for independent contractor versus employees. And that wasn't done by the district court. The district court just relied on the Swift case, the district court case Swift, and rejected the England case out of Utah and said this looks like, you know, an independent contractor. But there's no real analysis of the elements of right of control, is there? That's correct. And importantly, in this case, all of the cases, as Your Honor asked about the quantity of cases on each side of the fence on this issue, the cases that the district court and this court all deal with situations where we have a contract that specifically says you are not an employee, you are an owner, you are an independent contractor. This contract that they wrote does not say that. In fact, it says on page 3 of the contract, PMT is going to provide workers' compensation insurance, is going to provide union pension contributions, health insurance. Sorry, where are you on page 3 of the operating agreement and equipment lease? Right, section 501. Okay. Can I ask you another practical question that's confusing me? Okay. If we agree with you and the owner and operators are employees, then aren't they subject to the same grievance and arbitration clause contained in the Teamsters master agreement? Which dovetails into the next point. Yes. Yes and no. Because this contract at section 807 of the contract. 806 is the arbitration clause. Section 807 states, no waiver of remedies. No failure on the part of either party to exercise and no delay in exercising any right here under shall operate as a waiver, nor shall any single or partial exercise of any right preclude any other or further exercise of any further right. The remedies provided herein are cumulative and are not exclusive of any other remedies provided by law. That's a very general provision. When you've included an arbitration clause and we anticipate those things might be enforceable, then I don't see that that's inconsistent. It just says we're not waiving other rights that we might have. Well, if you have an arbitration clause, that's going to preempt some things. You're going to foreclose some things. Well, this says that all other rights and remedies provided by law are available and are cumulative to this. Notwithstanding the arbitration clause? Notwithstanding the arbitration clause. I don't see. If that said notwithstanding the arbitration clause, you might have a good argument, but I don't see that phrase in there. I just added it. I just made it up. So what does that mean? You can arbitrate and? And sue. Sue. And or. You can do either or. Well, how can that be? Because if these folks were just union employees for the Teamsters, forget this owner and operator agreement for a minute, they couldn't both sue and arbitrate. So it's almost as if you're saying this gives them more remedies, except for maybe the fraud and the inducement claim. I mean, that's a different. So is that what this is about? It seems to me if it's a claim of breach of contract and we agree that they are employees, then the question of whether the contract is breached would go to arbitration under the Teamsters Master Agreement because they are employees. Well, that gets back into the factual scenario of the case, and it will be part of what Mr. Crosby would be arguing. The Teamsters would not have anything to do with this because they were not privy to it and would not, were not allowed to see the contract. That's the problem. This contract was drafted by the employer, by PMD. I don't understand. This is a contract between the individual and the employer. You mean the Teamsters treated this as though it were a lease? They treated it as though these were not their employees? The Teamsters didn't have anything to do with it. They said it was out of their jurisdiction. Well, if it was out of their jurisdiction, that almost suggests then that these are not employees, doesn't it? That's an interesting question. They've incorporated the CBA by reference, but I couldn't figure out why the employer would want to, and this is a question I intend to ask the counsel, is why would the carrier incorporate language from the CBA if it was a lease for equipment? And I can't provide an answer to that. There is some language in the CBA about a buyback provision, but the Teamsters union wouldn't have anything to do with this. That doesn't make, that just frankly, I'm sorry. I used to be a labor lawyer, so this is kind of my thing, or was years ago. It just doesn't make any sense. I mean, the Teamster, the union doesn't just walk away and say, well, we're not going to have any part of this. If they did that, that's a breach of their duty of fair representation, so the claim that you should have to bring is both a breach of contract and a DFR, a hybrid DFR claim. I mean, this just doesn't make any sense to me. Well, I agree the contract doesn't make a whole lot of sense, and any ambiguities in the contract must be under law at California. Well, in all of these cases, there are a number of cases that have been litigated. There has never been any discussion of the role of the Teamsters in the collective bargaining agreement and the remedies? Not that I'm aware of, no. Counsel, I realize that we're cutting into your time, and I will allow you time for rebuttal. I still have a couple of questions. So even if this is a contract, even if this is a contract of employment, and these are employees, and therefore you qualify under Section 1 of the FAA, doesn't that just mean that Missouri law steps in? And under Missouri law, won't Missouri enforce the arbitration agreement, notwithstanding whatever the FAA might not have said? Under Missouri law, an arbitration agreement is enforceable with exceptions. And one of the exceptions here is Missouri law treats arbitration contracts as ordinary contracts. If there's fraud in the inducement or if there's misrepresentations, the contract is not enforceable. Also, if the contract has to be enforced. Well, that depends on whether you can prove the fraud claim. Yes. So if you can't prove the fraud claim, then you've got to go to the other side. If we disagree with you on the fraud claim, then under Missouri law, you're obligated to go to arbitration, notwithstanding the FAA. Isn't that correct? I'm sorry. Can you ask me that again? Yeah. Even if you're exempt from the FAA by virtue of Section 1, Missouri law says arbitration agreements are enforceable. Now, your defense is, well, we can't enforce that because there's fraud. If we disagree with you on the fraud claim, then you're in arbitration, aren't you, under Missouri law, but not by virtue of the FAA? Not by virtue of the FAA, but under Missouri law. Then you look to whether the arbitration clause is clear and unambiguous. And in this case, we feel that it's not. It's not clear and unambiguous? It's not because of Section 807. It immediately follows the arbitration clause. The remedies? Okay. And if I disagree with you on that, then you're into arbitration, right? Well, and that, of course, assumes that there is a proper arbitration clause. Well, but has the district court decided that question in this case? No. Why wouldn't it be preempted by Federal labor law? How could Missouri law apply if these are employees who are represented by the Teamsters? Isn't it preempted by Federal labor law under the NLRA? I don't have an answer to your question, but I think your question probably answers your question. It sort of goes to him. So, but that's not an issue that's, that's. But if we were to, if we were to agree with you in, I must say I have difficulty between the relationship of this case and the next one. If we were to agree with you in this case that the district court erred in interpreting and applying the arbitration provision, it would go back to the district court, wouldn't it? It should, yes. And then these issues, if we, just looking at this case, were going to be litigated before the district court. It would go back to the district court for a simple breach of contract and or tort-type theory. Okay. I see the amount of time. Yes, you're over your time, but I'm going to allow you some time for rebuttal,  Thank you. Mr. Thatcher. Thank you. And you are arguing the next case, is that correct? I am handling both cases for the appellees, yes, in both cases. May it please the Court, my name is David Thatcher, member of the Ogletree Deacons Law Firm, and I represent PMT. I'd like to start with, and the Court has recognized this, that there are, there's an overarching fact pattern in this case that's different from some of the cases that are cited, the split, if you will. And that is that there is a collective bargaining agreement in place in this case. And that's a very important fact, because PMT, I'll refer to Pacific Motor Trucking Company as PMT, if I may. PMT was a unionized employer, and what that meant was Are you saying that in none of those other cases was there a union? It was not a fact. We don't know that, do we? It was material in those other cases. But in those other cases, I'm presuming they were not, because many of the cases deal with the independent contractor and employee analysis. And I don't believe that comes into play in this case, because this case is different. There's no, so during the time prior to the owner-operator program, the appellants were driving as employee drivers. When the appellants became owner-operators, if they chose to drive the truck, they were then driving the truck as an employee driver, but they also wore a separate hat, which is the lessor of the equipment to the company. Importantly, once the lease agreements were canceled, which was allowed by both the collective bargaining agreement and the lease agreement, I'll refer to the owner-operator agreements as lease agreements, if I may. After that, each of the appellants had the option to go back and drive as an employee, continue their employment, a company-owned truck. And during all of that time, they were accruing Teamster's benefits. So I don't understand why the Teamsters would have any interest in enforcing a lease agreement. And you're here today because you're trying to enforce this. You want to make sure that this is not an employment, a contract of employment. It's termed a lease. We have a carrier and lease or defined terms here. So why is the CBA even part of this, if what this was was a lease? I didn't draft the agreement. But I will say that, so to the extent that P&T delivered freight, because it was unionized by the Teamsters, it was required to have a driver driving the truck that was a member of the Teamsters. Right. But that wouldn't have anything to do with an equipment lease. It has to do with who has to drive the equipment that is leased. Right. Because this has a non-compete. I thought the non-compete clause goes to who we could drive for. No? The non-compete, I don't believe, prevents the driver from driving for anybody he wants to. It just prevents you from using the equipment. That seems to be consistent with Mr. Wendler's position, which was that the non-compete clause was really a non-compete on the rig, not a non-compete on the driver. Yes, because the lease is dealing with the equipment, not the terms of employment. The terms of employment would have arisen under the collective bargaining agreement. So are you saying, just to make sure I understand your argument, are you saying that these folks remained employees of the company subject to the collective bargaining agreement as employees, but then they had a separate role as an owner and operator of a piece of equipment, and so they had two relationships with the company? Yes. That's what you're saying? Yes. So you're saying we should analyze the owner-operator agreement not under the traditional common law independent contractor-employee test, because you're Yes. Yes. For purposes of when they were sitting in the driver's seat of the truck, they were employees. So this is not just a lease for equipment. The first half of it looks like it's mostly a lease, and the second half looks like it's mostly about employment. Well, I think it's a lease agreement of equipment. To the extent that the collective bargaining agreement It was very schizophrenic reading that agreement. The first half looks like it could only be a lease, and the second half looks like it only could be a contract for employment. Right. I don't see in the lease agreement where it discusses the terms of employment. It talks about workers' compensation, social security, taxes, and so forth? Absolutely. Because of the fact that the company is leasing a piece of equipment from the lessor, and the lessor would certainly want the employee driving the truck to be subject to workers' compensation if there were an accident. That's something that it seems would be fairly common in a lease dealing with It says specific will provide that. It doesn't say the driver shall make sure that he has insurance, pays his taxes, has workers' compensation, et cetera. Because PMT is going to seat the driver in the truck, and it has to seat the driver in the truck. The unionized workforce would require that because whoever is going to drive for Right. That could be a whole separate bargaining arrangement. The CBA is independent from the lease. So all you have to have is a lease agreement. It seems to me all you have to have is a lease agreement that says we want to lease your rig. And then you have separately a CBA that says, well, of course we anticipate you're going to be driving your own truck, but our relationship with you as the driver is different from our lease with you as the owner of the rig. And I think where this got complicated, and this is where I was driving, the collective bargaining agreement, okay? There's a national agreement. There's a regional, a western area supplement. But those are negotiated between a car hauler's association, of which PMT was a member, and the International Brotherhood of Teamsters. And that particular you'll notice that attached to the plaintiff's complaint was Article 63 of the western area supplement, which actually has some language in it that clearly shows that the leases could be canceled. I'll come back to that point. But Article 63 in the collective bargaining agreement described and defined essentially all of the terms of the owner-operator agreement. The 68% of shared revenue, that was something that was negotiated between the union and the car hauler's association as a part of entering into the collective bargaining agreement. So I believe that the reason that many of the terms from the collective bargaining agreement make their way into the owner-operator lease agreement in this case is because the parties collectively negotiated concerning what the owner-operator program would involve. The Teamsters, they viewed, they had a right to control the delivery of freight. And so the owner-operator program is in Article 63 of the western area supplement. And I think that's the important point. So how was the arbitration agreement supposed to work here? So if there was a disagreement between the owner and PMT, then by incorporating by reference the CBA, there were certain deadlines, 15 days, 30 days to do certain things, and some of those involved a union representative. Were the Teamsters willing to get in and negotiate between a lease owner and PMT? I don't think that's a fact of record in this case. All of the appellants were members of the Teamsters. And under the grievance machinery, as it's called, which is in the national collective bargaining agreement, it's been in there for decades. It's a very important component. The first step is a local level addressing of the issue. It percolates all the way up to a joint area committee. And the joint area committee is composed of three management members and three Teamsters members. Importantly, the management members could be from other companies. And this goes to the substantive unconscionability issue. Wait, wait. But answer Judge Bivey's question because that's an important question. Because if the lease agreement incorporates all the provisions of the grievance process in the collective bargaining agreement, then that necessarily means the Teamsters are representing the owner-operator if he has a problem with Pacific, right? It has to be that way because they have a duty of fair representation. And that's where I suppose the analysis becomes somewhat cyclical in that, yes, there is a provision that would require the owner-operator to raise the issue with the union. But there is also a provision where I believe the owner-operator, the driver, whomever is raising a grievance, in the case of the lease, it would be an owner-operator. If the union does not timely respond, then that driver or owner-operator presents the grievance in writing and pursues that up through the, up to the top, which would be the joint area committee. So did anybody take these grievances to the union? I'm not aware of any grievances that were filed concerning the owner-operator program. But we don't know whether the union would have been, would have had any interest in getting in the middle of this at all. We, in the Russell case, we attempted to subpoena the business agent, but we were unsuccessful at doing so to attempt to answer that question. What is the, so I'm confused, what is the National Master Automobile Transporters Agreement? That's the national CBA. So that's between the Association of Car Haulers and the International Brotherhood of Teamsters. Brotherhood of Teamsters. Yes. That's the big agreement for the team, for the Teamsters union. The agreement. So you're going to arbitrate this in accordance with that agreement? Yes. It's the grievance machinery section, I think it's section 7. Right. So with respect to the FAA, what is it that you want us to hold? That it does not apply to this agreement. Because it's a lease agreement? Because it's not an employment contract. Not an employment contract, even though the union's involved in all of this and referred to? And if it is an employment contract, then the Labor Management Relations Act preempts the FAA with respect to that issue. Okay. So if the FAA, let's suppose, that we held that this was in some respects an employment agreement, so that it was exempt from section 1, Missouri law would still enforce the arbitration agreement, right? I believe that's correct. Okay. Is that what the district court held? I don't believe the district court got to that point correctly. Did you make that argument? I don't recall if we did or not. I don't believe that was a specific point that we raised. At any point in this litigation? I don't believe we have yet. If you haven't, have you waived it? No, I don't believe we have. This is a motion to dismiss. So it's a de novo review of the application of the law. I asked the question earlier, maybe I'm misunderstanding something. Why would Missouri law apply if these are unionized employees subject to the NLR? That's where I have a problem, is that if Missouri law applies, I still think that ultimately if this is an employment contract, and that's the important, it seems to me, issue, then the collective bargaining agreement is incorporated. This is a rising out of a collective bargaining agreement. It's a dispute arising out of a collective bargaining agreement. And the case on point 315F3rd721, SMART v. International Brotherhood of Electrical Workers, it's a Seventh Circuit 2002 case which resolved the conflict between the FAA and the Labor Relations Act in favor of the Labor Relations Act, saying that it preempts all other laws resolving disputes arising out of a collective bargaining agreement. I'm sorry. Go ahead. Why did you just say then that Missouri law would enforce it if, you know? I think it should be enforced either way. Well, I know that, but isn't it a preemption? Ultimately, I believe it's a preemption issue. But I don't believe it's an employment contract. And I guess that's the difficulty to accept that point. It's very odd duck to have something that's not an employment contract with a provision that says that the disputes are going to be arbitrated in accordance with a collective bargaining agreement. Well, again, because of the fact that PMT was unionized and because of the fact that the collective bargaining agreement included a specific recitation of many, if not all, of the terms of the owner-operator program, it seems like that would have formed the basis for incorporating the grievance mechanism into the owner-operator agreement. You know, the employer drafted this agreement, right? That's true. So don't we, and obviously from all these questions, this is about as ambiguous of a situation as you can imagine, it seems to me. Don't we have an obligation to read this contract and try to make sense of it in a way that is favorable to the employee or contractor, not to the employer? It has to be interpreted against the drafter, doesn't it? And that's the general rule of law. We're on a motion, a 12B6 motion, and so you review the facts and the complaint in the light most favorable to the appellant as well. But ultimately, if you look at the Western Area Supplement and the fact that this was a collectively negotiated program, I think that is the point that has to be considered. That's why I raised at the very beginning the issue of the collective bargaining agreement being an overarching issue in this case. But it's not what the plaintiffs say. They say the union walked away from this and said they wanted nothing to do with it. Yeah. But that's not the program and the material terms of the program are negotiated and in the collective bargaining agreement. Whether the union decided they don't have a claim or not and decided not to pursue the grievance on their behalf. The program is between the Haulers Association and the union, not between Pacific and the union, right? Well, it's under the Western Area Supplement. Right. So it would be between the Western Area. But the point is when Pacific decided to do this itself and it drafted up this agreement, it was maybe pursuant to that Western Area agreement. But then it gave it to the union and the union walked away. Is that what happened? When you say they gave it to the union and walked away. Or gave it to the drivers and then the union, they say the union walked away and didn't want anything to do with it. I'm not making sense of this. I don't understand that point either. I don't know what evidence that's based on. I mean, the company opened an owner-operator program. It allowed outside owner-operators to come in as well as employees. It wasn't just, hey, employees go buy trucks. There was no requirement that they buy trucks. It opened the program. It maintained the program. The 2008 recession comes, crisis in the auto industry. They terminate the program. I don't understand what it means that the union walked away. If there was something that happened internally that the union did not pursue the grievance on behalf of the appellants, it's not in the record. I don't understand that. Okay. Yes. If you have any other questions, but otherwise, thank you for your time. Just tell me again, what is your understanding of what the district court held? Was it ruling under the FAA? Yes. The case is decided under the FAA? It decided that the appropriate test, it looked at the split of authority, the United Van Lines and the Swift case, and it compared that with the C.R. England case, and it said, we think the better test is to have the appellants prove that the exemption applies, which they did not in this case, and therefore I'm going to hold that it's not an employment contract. And is that what you argue? Yes. Yes. Okay. Thank you, Mr. Thatcher. Thank you very much. Mr. Weber? Let's put two minutes on, and I'll hold you to the two minutes. Just a couple of quick things. The record addresses the question that you asked Mr. Thatcher about the union's involvement. We actually deposed and submitted excerpts of the testimony of Mr. Thompson. This is on page 108 of the record. That is the ERs at 108? Correct. And what does he say? He was the union shop steward, and he participated in one of the meetings, and then he was excluded. And he was asked if there was anything else he was involved in. He said, there wasn't much communication. When the owner-operator program came in, I asked for a lease agreement. They wouldn't give me one. I asked for it many times. They would not give me a lease agreement on the owner-operators. Is that before the leases were signed or after the leases were signed? He doesn't say. I'd have to go back and read the transcript. Because our understanding was that the union was not, part of the union's unhappiness was that they weren't allowed to see this before they were signed. So that would be consistent with that, but it wouldn't tell us whether the union was not involved after the leases were signed. Well, then we also submitted declarations of five different drivers. This is found at page ER116 for the next 10 or so pages, declarations by Mr. Russell, Froeg, Child, Morgan, and Napoles. And it says these declarations state, PMT refused to permit the union representatives to participate in some or all of the owner-operator meetings. Again, is that before the leases are signed or after the leases are signed? Before they're signed. Okay. And they also state, we were told, it was stated by PMT, there would be no right to file a grievance or present claims through the union grievance proceedings for anything related to the PMT owner-operator program. And it's not just one declaration, but we have five declarations of drivers that stated this in our declaration. Those are all declarations at this point, so haven't been contested, haven't been tested in a deposition, no response has been permitted at this point. Well, the depositions were taken in the companion case, but no depositions were taken in this case, yes. Okay. I don't have anything else. All right. Thank you, Mr. Wendler. Any other questions, I'll sit down. Thank you. We thank both counsel for the argument. Alvarado versus Pacific Motor Trucking Company will be submitted.
judges: Schroeder, Bybee, Smith